**FRIEDLAND et al. v. THE EMPRESS et al.**

**THE EMPRESS.**

**THE GAREY.**

No. 2155—PH.

District Court, S. D. California,
Central Division.

Jan. 7, 1943.

Lloyd Walter Vivell, of San Pedro, Cal., for libelant.

Perry G. Briney, of San Pedro, Cal., for respondent.

HALL, District Judge.

The libelants seek to recover from the respondents in rem and in personam the value of a cargo of scrap metal which was lost when the Barge Empress, being towed by the Tug Garey, capsized in the Catalina Channel.

Edward L. Barker and Lula A. Barker were doing business under the name of Independent Tow Boat Service and owned the Barge Empress, and the Tug Garey. Subsequent to the filing of the complaint he died. At the commencement of the trial, on a motion of counsel for defendants, the action abated as to Edward L. Barker and remains pending against only the Tug Garey, and L. G. Barker, the Master of the Tug, and Lula A. Barker, the surviving owner of both Tug and Barge. The Barge Empress was never attached.

On September 15, 1941, the owner of the Barge and Tug entered into a written contract with George M. Friedland and Jack Bedford whereby the latter two rented the "bare" Barge Empress at $10 a day and hired the Tug Garey at the rate of $4.50 per hour while engaged in towing and $8 a day for lay-over time. Under the contract the respondent owner "shall have the supervision as to loading." It was also provided that the respondent owner "takes no responsibility in the event of damage or loss of cargo." The libelants herein were to furnish all labor for use in loading and unloading of Barge.

Several trips were made hauling scrap iron, and on the fourth and last trip the Barge Empress capsized in the Catalina Channel and the load was lost.

I will dispose first of the claim made by the libelants that they are entitled to recover on account of alleged negligent navigation by the Tug in towing the Barge across the Channel. Libelants contend that even though the contract might exempt respondents by its terms from loss, such provisions are void, because a Tug Boat cannot by contract exempt itself from liability for negligence. Alaska Commercial Co. v. Williams, 9 Cir., 128 F. 362.

■ But the duty of a tug is not the duty of a common carrier. No presumption of negligence arises from the fact of a loss or injury, and such negligence must be proved. The Sea Lion, (Hammond Lumber Co. v. The Sea Lion), D.C.N.D.Cal., 12 F. 2d 124, 1926 A.M.C. 265.

The question on this phase is whether or not there was negligence on the part of the Tug or its Master.

The evidence shows that the load left Catalina about 7 p. m. on November 2, 1941 with a slight list of the Barge; that heavy seas were encountered shortly after leaving the mooring; that the Barge began weaving a little while after encountering the heavy seas; that the Master of the Tug sent a man back to the Barge who reported a shift of the cargo and a heavy list by the Barge; that thereupon the Master shortened the tow line to prevent the weaving; that they proceeded with the shortened tow, which broke once and was tied; that shortly thereafter the Barge capsized and lost her cargo.

Some point was made that the tow line was so short as to constitute negligence, but I am inclined to believe the testimony of the Master of the Tug, that the tow line was long until the weaving began and that he put a "halter" on and shortened the line to prevent the weaving. Expert testimony was produced to show that this was good seamanship.

The Barge left Catalina about 7 o'clock in the evening. Expert testimony was produced to the effect that it would have been unsafe to have remained anchored in Catalina Harbor during the night at that season of the year; that at that season of the year rough seas came in and other barges had been wrecked and beached in the same vicinity and that good and careful seamanship would require the Master of the Tug, in a choice of hazards, to put to sea and endeavor to reach the mainland, rather than anchor in the Harbor with the listing Barge.

The conduct of the Tug and its Master was hence not negligent and no recovery can be had on that account.

■ From the evidence it must be concluded that the cause of the capsizing of the Barge was not the negligent navigation of the Tug, but the list of the Barge; and that the list was caused by the improper stowage of the cargo of scrap metal.

The next question is to determine who is responsible for that improper loading.

The original contract as above pointed out provided in its terms that the owner "shall have the supervision as to loading." The evidence showed that on the first trip the Barge owner did "supervise" the loading; but the loading took 9 or 10 days and

the libelants at the conclusion of the voyage complained that it took too long, and thus ran up their costs of rental on both the Barge and the stand-by hiring charge of the Tug. After meetings between the libelant and the respondents, the evidence shows that all of the parties agreed that the libelants should load the boat—in fact respondents' deck hand who helped with the loading was told that one "Ray" employed by libelants would be "my Boss"; and that on the second and third trip this procedure was followed. While the deck hand "severed his connections" with the venture before the capsizing trip, I am satisfied from the evidence that the same procedure was followed on the last loading and that libelants had complete charge of the loading; and that they did so in order to reduce the nnmber of days they would be required to pay rental on the Barge and the Tug at a total of $18 a day.

 The original contract was divisible. Restatement: Contracts Par. 266, p. 385. At the conclusion of the first trip, by agreement of the parties, the respondent surrendered his right to "supervise" the loading of the Barge in consideration of additional trips—and the libelants secured the right to save $18 a day for every day they could cut down the loading time. While this agreement was oral, the parties nevertheless proceeded to and did execute it until all of the scrap metal was loaded on the Barge on its last trip.

It was thus a lawful alteration of the written contract by an executed oral agreement. Civ.Code Cal. § 1698.

The libelants, to save themselves money, secured the privilege of loading the Barge; they must take the responsibility with that privilege and cannot now collect damages for their own negligent act in improper stowage of the Barge.

The principle applicable to public carriers (The Indien, 9 Cir., 1934, 71 F.2d 752) that improper stowage constitutes unseaworthiness of a vessel and that the owner cannot escape liability for such unseaworthiness by contract is not controlling here for the very obvious reason that respondent was not a public carrier in the instant matter and that libelants rented the "bare" barge and made her unseaworthy by their own improper stowage of the cargo.

Coming now to a consideration of respondent's counterclaim for repairing the damage done to the barge by the shifting of the cargo and capsizing. As the contract is divisible with relation to the rental of the "bare" barge, it does not necessarily follow that the rights and obligations of the parties are to be considered and determined by their rights and obligations concerning the tug and tow. It is as if independent parties owned the barge.

The owner-respondents are not entitled to recover on their counterclaim. While it is true that they did not load the barge, they nevertheless knew it was being improperly loaded, and that it did list when loaded. They could have refused to permit the continued improper stowage, or refused to permit it to be towed. But nevertheless as owners of the barge, they did undertake to tow her across the Channel, knowing of the dangerous list before they started. Hence, they cannot recover for their own wrong.

Neither libelants nor respondents are entitled to recover and each will pay their own costs.

Let findings and judgment be prepared accordingly.